\\

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 0 3 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| NEVGULMARCO COMPANY, INC.; | § | |
| ZIMCO MARINE, INC.; | § | |
| and CARMELITA, INC. | § | |
| | § | C. A. NO. B-03-153 |
| v. | § | |
| | § | |
| ANGEL ROMERO, JR. | § | |

## PLAINTIFFS' BRIEF IN SUPPORT OF JURISDICTION

TO THE HONORABLE JUDGE OF SAID COURT:

    **Nevgulmarco Company, Inc.; Zimco Marine, Inc.; and Carmelita, Inc.** file this brief in support of the jurisdiction of the United States District Court in the above styled and numbered cause:

### Statement Of The Case

    The case set out for the Court in the Plaintiff's (sic) Original Petition was, at the time of filing, an accurate representation based on the limited knowledge of the various Plaintiffs. At the time of filing of Plaintiffs' suit in this Court, no other suit was on record in either the state or federal courts. Since that time, several various persons have filed suit in state court asserting tort claims of negligence under general maritime law and the Jones Act. This state suit was made known to the Plaintiffs upon receipt of the motion to dismiss filed by Angel Romero, Jr. on September 22, 2003 and delivered to Plaintiffs' Counsel by facsimile transmission on September 23, 2003. While Plaintiffs herein do not admit any of the tort claims, the motion to dismiss also contains factual recitations from the viewpoint of Angel Romero, Jr.

## Nature Of The Case

After the initial hearing on the Motion to Stay filed by Plaintiffs herein, Counsel for those Plaintiffs was advised that the policy of health and accident insurance owned by Nevgulmarco Company, Inc. insuring Angel Romero, Jr. was purchased as a part of a plan pursuant to the Employee Retirement Security Act of 1974 (ERISA). 29 U.S.C. § § 1001-1461. A copy of the Summary Plan Description is attached hereto as Exhibit A.

## Argument And Authorities

Jurisdiction is vested in this Court in this matter in two separate ways. This Court has concurrent jurisdiction with state courts in all cases brought pursuant to the Jones Act. 46 U.S.C. App. § 688. This Court has exclusive jurisdiction regarding all civil actions brought under ERISA with certain limited exceptions:

1.    **Jones Act**.    The cited section of the Jones Act provides that "(j)urisdiction in such actions (personal injury) shall be in the court of the district in which the defendant employee resides or in which his principal office is located."

There is no controversy that Angel Romero, Jr. was a seaman engaged in the course of his employment on board the O/S "Carmelita" at the time he lapsed into a coma. There exists no doubt that the provisions of the Jones Act apply and jurisdiction is established in "the courts of the district" in which the principal office of Carmelita, Inc. is located. Defendants stipulate that the principal office of that corporation is located in Cameron County, Texas.

2.    **ERISA.**    The plan under ERISA established for the benefit of Angel Romero, Jr., as shown by Exhibit A, is an occupational injury benefit plan which provides for employee benefits as a result of job-related injuries.  The plan does provide benefits for the common-law tort claims and statutory claims alleged by Angel Romero, Jr.  The suit brought by and for the benefit of Romero does relate to this employee benefit plan and is, therefore, preempted by ERISA and falls within that provision establishing exclusive federal cause of action for resolution of such disputes.

The plan established by Nevgulmarco Company, Inc. for the employees of each of its subsidiaries, including Carmelita, Inc., qualifies as an ERISA plan.  At page 3 of the Summary Plan Description, it identifies the eligible class of insureds, sets forth the procedure for receiving benefits and indicates that the cost of the plan is paid in full by Nevgulmarco.  The plan was established and is maintained by an employer with the intention of benefitting its employees.  See *Memorial Hospital System v. John Hancock Mutual Life Insurance Company*, 952 F.Supp. 449, 453 (S.D. Tx. 1996).

Subject matter jurisdiction under ERISA is explained in *Gorman v. Life Insurance Company of North America*, 811 S.W.2d 542, 545 (Tex. 1991):

> "Sections 1132(a)(1)(B) and (e) of ERISA provide that state courts of competent jurisdiction and district courts of the United States have concurrent jurisdiction of actions by a beneficiary:  1) to recover benefits due under the terms of the plan; 2) to enforce rights under the plan; or 3) to clarify rights to future benefits.  Any other civil ERISA action is within the exclusive jurisdiction of the federal courts. 29 U.S.C. § 1132(e)(1)(1988).  Accordingly, when a state court suit alleged in terms of a state common-law or statutory cause of action 'relates to' an employee welfare plan, ERISA may preempt the state law in favor of federal law."

The United States Supreme Court in *Metropolitan Life Insurance Company v. Taylor*, 481 U.S. 58, 67, 107S.Ct. 1542, 1548 (1987) explained that even if a suit purports to raise only state law claims, it "is necessarily federal in character by virtue of the clearly manifested intent of Congress" and "arises under the . . . laws . . . of the United States." This type of suit, under ERISA, is "removable to federal courts by the defendants, 28 U.S.C. § 1441(b)." *Metropolitan Life Insurance Company v. Taylor*, 481 U.S. at 62-63. The facts in *Taylor* are that the plaintiff was injured in a car accident. His employer had a plan covered by ERISA. A dispute arose and suit was brought in a state court seeking recovery of plaintiff's disability benefits together with claims for mental anguish, wrongful termination and wrongful failure to promote him. The Supreme Court held, by the language cited, that as a suit by a beneficiary to recover benefits from a covered plan, the suit fell directly under the civil enforcement provisions of ERISA and was, therefore, preempted. Also see *Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311 (5th Cir. 1994).

A case decided on the same date as *Metropolitan Life Insurance Company v. Taylor* is *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549 (1987). This suit was brought to assert common-law breach of contract and tort claims. Plaintiff injured his back in an accident related to his employment. His employer had an ERISA plan established by purchasing a group insurance policy. The Court expressly held that "(u)nless these common-law causes of action fall under an exception to § 514(a), . . . , they are expressly pre-empted." *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. at 48. The basis for the holding

was that "(t)he conclusion that § 502(a) was intended to be exclusive is supported, first, by the language and structure of the civil enforcement provisions and, second, by legislative history in which Congress declared that the preemptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U.S.C. § 185." *Id.* at 52.

A review of the Plaintiffs' Original Petition and Requests for Disclosure filed by Romero and others (hereinafter collectively called "Romero's") and now removed from state court amply demonstrates that Angel Romero's causes of action are both common-law based and statutorily derived; that the additional causes of action asserted cannot be brought under 29 U.S.C. § 1132(a)(1)(B); and that all such causes of action relate to the ERISA plan. The term "relate to" has been broadly defined to mean merely having "a connection with or reference to such a plan". *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. at 47, 107 S.Ct. at 1553. All of such causes of action relate, therefore, to the ERISA plan in effect and each is subject to the preemption within ERISA. Applying the above referenced United States Supreme Court holdings to Romero's causes of action, it is clear that they fall within the scope of ERISA and are subject to removal to federal court. Furthermore, the same United States Supreme Court cases unequivocally hold that Congress intended ERISA to be the exclusive mechanism for any type of civil enforcement as it pertains to an ERISA plan.

Even if this Court was to decide that some of the causes of action alleged by Romero that both state and federal courts, of the appropriate district, had concurrent jurisdiction or that the negligence claims do not "relate" to ERISA, this Court has

jurisdiction over the ERISA claims and the Court can exercise supplemental jurisdiction over a non-related claim.   See Hernandez v. Jobe Concrete Products, Inc., 282 F.3d 360, 362 (5th Cir. 2002); citing 28 U.S.C. § 1367(a); Pyle v. Beverly Enters-Tex., 826 F.Supp. 206, 211-12 (N.D. Tex. 1993).  Upon review of Romero's state court petition, paragraph 4.1 unequivocally and clearly states Plaintiffs "file this suit for the enforcement of laws enacted for his health and safety." (See attached as "Exhibit B" a copy of Romero's state court petition which is incorporated herein). This allegation obviously is a claim against Nevgulmarco's Occupational Injury Benefit Plan. Thus, this claim relates to Romero's status as a beneficiary of a benefit plan and falls within the federal court's jurisdiction and is removable pursuant to 28 U.S.C. § 1441(b). Hernandez, 282 F.3d at 362; citing Taylor, 481 U.S. at 67 (holding causes of action falling within ERISA's enforcement provisions codified at 29 U.S.C. § 1332 are removable under complete preemption doctrine); Anderson, 11 F.3d at 1315.

Additionally, Romero's state court claim alleges in paragraph 4.2 that the causes of action are brought under the "Admiralty and General Maritime Laws of the U. S. . . . as well as any other . . . Federal Laws." 28 U.S.C. § 1333 succinctly states: "The district courts shall have original, **_exclusive_** of the courts of the states of (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled . . . " 28 U.S.C. 1333(1) (Emphasis added). If these claims relate to an ERISA plan, the federal court jurisdiction

is exclusive. *Iron Worker's Mid-South Pension Plan v. Terotechnology Corp.,* 891 F.2 548, 553 (5th Cir. 1990).

Applying this case law and the applicable cited statutory mandates to Romero's causes of action, it is clear that this Court has subject matter jurisdiction to hear a substantial portion of Romero's claims as they clearly involve a federal question. Further, as to any other claim that this Court may not have subject matter jurisdiction over, this Court can exercise supplemental jurisdiction as these claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U. S. Constitution." 28 U.S.C. § 1367. As such, this Court has jurisdiction to hear this case.

DATED:  October _3_ , 2003.

Respectfully submitted,

COUNSEL FOR
NEVGULMARCO COMPANY, INC.
and CARMELITA, INC.:
Tom Fleming
FLEMING & HERNANDEZ, P.C.
1650 Paredes Line Road, Suite 102
Brownsville, Texas 78521-1602
Telephone:  (956) 982-4404
Telecopier:  (956) 982-0943

by:

**Tom Fleming**
SBOT No. 07133000
Federal I.D.  No. 1188

**Jeffrey G. Mathews**
SBOT No. 24013115
Federal I.D. No. 24499

COUNSEL FOR
ZIMCO MARINE, INC.:
Jaime Saenz
SBOT No. 17514859
Federal I.D. No. 7630
Rosamaria Villagomez-Vela
RODRIGUEZ, COLVIN & CHANEY, L.L.P.
P. O. Box 2155
Brownsville, Texas  78522
Telephone:  (956) 542-7441
Telecopier:  (956) 541-2170

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing PLAINTIFFS' BRIEF IN SUPPORT OF JURISDICTION were served October ___3___ , 2003 in the manner(s) indicated below upon the following Counsel:

> **CO-COUNSEL FOR ANGEL ROMERO, JR.:**
> Mikal C. Watts
> Ray R. Marchan
> WATTS LAW FIRM, L.L.P.
> 1926 East Elizabeth Street
> Brownsville, Texas 78520
> *(Certified United States Mail, R.R.R., #7002 2030 0007 1000 01974)*
>
> **CO-COUNSEL FOR ANGEL ROMERO, JR.:**
> Ernesto Gamez, Jr.
> LAW OFFICES OF ERNESTO GAMEZ, JR.
> Justice For All Building
> 777 East Harrison Street
> Brownsville, Texas 78520
> *(Certified United States Mail, R.R.R., #7002 2030 0007 1000 0187)*

Tom Fleming

---

**PLAINTIFFS' BRIEF IN SUPPORT OF JURISDICTION**
TF/bgw  #031087  L:\WARNKE\CLIENT\ZIMCO\Carmelita Inc\Romero\Nev. v Romero\Jurisdiction-Brief.wpd

# SUMMARY PLAN DESCRIPTION

## OCCUPATIONAL INJURY BENEFIT PLAN FOR THE EMPLOYEES OF

## **NEVGULMARCO CO., INC.**

**\*\*\*\*\*\*\*\*\***

**\*\*\*\*\*\*\*\*\***

**State of Texas**



EXHIBIT NO. A

SUMMARY PLAN DESCRIPTION FOR

**NEVGULMARCO CO., INC. (The Company)**

## SCHEDULE OF BENEFITS

| | |
|---|---|
| Plan Number: | **007275-OA** |
| Effective Date of this Plan: | **July 1, 2002** |
| Plan Administrator: | **Harley Londrie** |
| | **400 Washington Street** |
| | **Port Isabel, Texas 78578** |
| | |
| Telephone: | **956-943-2672** |
| Type of Coverage: | Occupational Accident Protection |
| Plan Type: | **502** |
| Beneficiary: | Estate or Designated Person |
| Federal Tax ID#: | **74-2075063** |

The Participation in this Plan applies only to the covered employees of **NEVGULMARCO CO., INC.** Benefits shall apply per accident, subject to the terms, limitations and restrictions of the Plan. Claim or dispute arising out of any accident or occurrence will be resolved exclusively through alternative dispute resolution procedures, including final binding arbitration.

### BENEFITS

| | |
|---|---|
| Combined Benefit Amount: | **$300,000.00** |
| AD&D Benefit Amount: | $150,000.00 |
| | |
| <u>Accidental Death and Dismemberment</u>: | See Schedule of Loss page 9 |
| | |
| <u>Accidental Disability Benefit*</u>: | |
| Benefit Amount: | 75% up to $600.00 |
| Combined Benefit Period (weeks): | **104** |
| Elimination Period (days): | 7 |
| Disability Commencement Period (days): | 90 |
| | |
| <u>Accidental Medical Expense Benefit</u>: | |
| Coverage Rate**: | 100% |
| Combined Benefit Period (weeks): | **104** |
| Medical Commencement Period (days): | 30 |

**All benefits payable under this endorsement are subject to and limited by the above Schedule of Benefits.**

**Aggregate Limit of Liability:** $2,000,000.00 per Accident. The Company shall not be liable for any amounts in excess of the Aggregate Limit of Liability. No coverage is provided for expenses incurred as a result of Sickness.

\*     Weekly Benefits are subject to a Maximum Benefit equal to 75% of the Covered Employee/ Employee Base Salary, inclusive of bonuses, overtime and commissions.

\*\*    Subject to Usual and Customary Charges for Medically Necessary Services.

7

## Summary Plan Description

### Occupational Accident Plan

For a complete description of the Plan, its benefits, and a Covered Employee's rights to receive the Plan's benefits, please consult the Plan Document and its Adoption Agreement.

### The Plan and the Plan Employer (Company)

See the attached copy of the Adoption Agreement.

### Type of Plan and Plan Benefits

The Plan is an Occupational Accident Plan established to provide benefits to employees who are injured in a work-related incident, while performing their job furthering the Company's interest. The Plan provides benefits to compensate employees or their beneficiaries for; 1) Accidental Death, Dismemberment and Loss of Use; 2) Accidental Disability; and 3) Accident related Medical Expenses. Consult the included Schedule of Benefits, which summarizes the type of Plan, specific benefits, maximum benefit amounts, benefit periods, provided covered employees. If benefits provided by this Plan are also provided by another plan or insurance policy, the benefits paid by this Plan are reduced so that the total benefits, when combined with benefits of all other plans or policies, do not exceed the maximums provided by this Plan.

### Schedule of Accidental Death, Dismemberment and Loss of Use

| Loss of | Benefit |
|---|---|
| Life | 100% of the AD&D Benefit Amount |
| Both Hands | 100% of the AD&D Benefit Amount |
| Both Feet | 100% of the AD&D Benefit Amount |
| Sight of Both Eyes | 100% of the AD&D Benefit Amount |
| One Hand and One Foot | 100% of the AD&D Benefit Amount |
| One Hand and Sight of One Eye | 100% of the AD&D Benefit Amount |
| One Foot and Sight of One Eye | 100% of the AD&D Benefit Amount |
| Speech and Hearing in Both Ears | 100% of the AD&D Benefit Amount |
| Use of Both Arms and Both Legs | 100% of the AD&D Benefit Amount |
| Use of Both Arms or Both Legs | 75% of the AD&D Benefit Amount |
| Use of One Arm and One Leg | 75% of the AD&D Benefit Amount |
| Speech | 50% of the AD&D Benefit Amount |
| Hearing in Both Ears | 50% of the AD&D Benefit Amount |
| One Hand | 50% of the AD&D Benefit Amount |
| One Foot | 50% of the AD&D Benefit Amount |
| Sight of One Eye | 50% of the AD&D Benefit Amount |
| Use of One Arm or One Leg | 50% of the AD&D Benefit Amount |
| Thumb & Index Finger of the Same Hand | 25% of the AD&D Benefit Amount |

A BENEFIT IS NOT PAYABLE FOR BOTH LOSS OF THUMB AND INDEX FINGER OF SAME HAND AND LOSS OF ONE HAND FOR INJURY TO THE SAME HAND AS THE RESULT OF ANY ONE ACCIDENT.

1

LOSS MEANS, WITH REGARD TO:

- a) Life means a death, which is the direct result of an Accidental Bodily Injury;
- b) The hand means the actual, permanent and complete severance of all four fingers or the actual permanent and complete severance through or above the wrist joint;
- c) The foot means the actual, permanent and complete severance through or above the ankle joint;
- d) Sight means the total and irrevocable loss of sight;
- e) Speech and/or hearing means the total and irrevocable loss of the entire faculty of hearing and/or speech; and
- f) Thumb and index finger means the actual, permanent and complete severance through or above the metacarpophalangeal joints.

LOSS OF USE means the total loss of movement or total feeling in the arm including the hand and/or leg including the foot. This loss must be determined by a physician to be complete and irrevocable.

The amount of benefit payable will be less any payments made to or on behalf of the Covered Employee for any other benefits payable under this Plan that are the result of the same Accident, subject to the following provisions:

1) the AD&D Benefit Amount for loss of life, loss of use and dismemberment shall be limited to the AD&D Benefit Amount, or the Combined Benefit Amount shown on the Schedule of Benefits, whichever is less.

2) the amount payable for Accidental loss of Life is guaranteed to be no less than fifteen percent (15%) of The Combined Benefit Amount shown in Schedule of Benefits, regardless of the total amounts paid for any other benefits under this Plan.

## Accidental Disability

If you are totally disabled within ninety (90) days following an accident, you will be entitled to receive the Accidental Disability Benefit. The Amount of the benefit is the lesser of seventy-five percent (75%) of your base salary or the maximum disability benefit of $600 per week. Benefits will continue to be paid until you no longer meet the definition of Total Disability, return to work or the maximum benefit period has expired. You may be required to periodically submit to the Plan Administrator proof of your total and continuous disability. Failure to do so can result in the termination of your accidental disability Benefits. Refer to the Plan Document and Schedule of Benefits for exclusions or limitations to the Accidental Disability Benefit.

## Accident Related Medical Expenses

When an injury results in your incurring covered medical expenses, the Company will reimburse you the costs of those medical expenses up to the Combined Benefit Amount per accident. Covered expenses generally include "usual and customary" expenses that are "medically necessary" and ordered or administered by a Physician.

Only those expenses for medical treatment incurred within the Combined Benefit period selected will be reimbursed. However, in order to be eligible for coverage of medical expenses, the first medical treatment must be received within thirty (30) days of the accident.

The Plan provides an Aggregate Limit of Liability should several employees be injured in one common accident.

2

Specific exclusions from coverage under the Plan include but are not limited to: injuries from criminal, illegal or felonious acts; unnecessary cosmetic surgery; treatments that are not medically necessary; charges in excess of usual and customary charges for the treatment or service; and experimental medicines, supplies or services.

For a complete listing of covered expenses and any exclusions or limitations, refer to the Plan Document and the Schedule of Benefits.

## Eligibility to Participate
## in the Plan's Benefits

You are eligible to participate in the Plan on the date you become an employee of the Company. Generally, this means you are entitled to Plan benefits on your first day of work. There are no minimum-age or years-of-service requirements found in other types of benefit plans. No enrollment forms are necessary.

Participation ceases only when your employment with the Company terminates, or the Plan terminates. If you are receiving benefits and the Plan terminates, the benefits will continue as provided in the Plan for accidents occurring before the termination date as though the Plan was not terminated.

## Requirements to Receive Benefits

You must comply with certain requirements in order to receive benefits from this Plan. You are required to immediately report the accident; cooperate with and follow all instructions given by the attending Physician; use Company prescribed medical care providers; submit to alcohol and drug testing at the time of your initial treatment; and furnish the Administrator with the required accident report. Benefits will not be paid or will be discontinued upon discovery that the accident was self-inflicted, intentional or staged or that the injury was caused by horseplay, fighting inappropriate behavior or violation of the reasonable safety rules implemented by the Company.

You are also required to submit to the Administrator timely proof of loss to substantiate the benefit claim.

## Plan Funding

The Company has the ultimate responsibility to pay all benefits provided in the Plan. However, the Company has the right, not the obligation, to purchase insurance to supply funds to pay the benefits provided by this Plan. Any such insurance contract shall be owned by the Company and no Covered Employee shall have a right or interest in the benefits paid by the insurance contract to the Company. The Company has purchased an Occupational Accident Policy from a reputable insurance company. The insurance policy is incorporated as part of the Plan. The specific provisions of the insurance policy concerning the amounts of coverage and covered matters control the Plan in the event of a conflict between the documents. You may review the Plan Document and the underlying insurance policy upon request to the Plan Administrator.

3

OCCUPATIONAL INJURY BENEFIT PLAN SUMMARY - ERISA

## Arbitration

By continuing to work for the Company, you acknowledge and expressly agree that any claim or dispute arising out of any Accident or Occurrence, or otherwise regarding or relating to the Plan, will be resolved exclusively through alternative dispute resolution procedures, including final and binding arbitration. The arbitration proceeding shall be conducted in the county where the Company is located or has its principle business office, in accordance with the provisions of the Federal Arbitration Act, and the applicable dispute resolution rules of Dispute Solutions, Inc. ("DSI") in effect at the time the demand for arbitration is made. You are free to hire your own attorney for the proceedings at your own expense but are not required to do so. Arbitration shall be requested in writing no later than one (1) year form the date of the incident that led to the request for arbitration. The arbitrator (or arbitrators) shall be chosen from a list provided by DSI. The arbitrator shall coordinate and limit as appropriate all pre-arbitration discovery, which shall include document production, information requests and depositions. Discovery and related procedural matters shall be conducted in accordance with the Federal Rules of Civil Procedure. The arbitrator shall issue a written decision and award, if any, stating the reasons therefore. The decision and any award shall be final and binding.

**No contractual relationship is hereby created other than this agreement to arbitrate. Your employment with the Company shall continue to be "at-will," which means you may quit or be fired any time for any reason, or for no reason, with or without notice, at the Company's discretion.**

## Plan Administration

See the copy of the Adoption Agreement attached to the Plan.

## Claim Procedures and Remedies for Redress of Claims

You are required to <u>immediately</u>, or in any event no later than the end of your shift or daily work duties, notify the Administrator or your supervisor of any accident causing an injury.

### File a Claim For Benefits

If you wish to file a claim for Benefits under the Plan, you should contact your supervisor for the proper claim forms, which you must complete and file with the Plan Administrator. To obtain list of approved health care providers you should contact your supervisor.

If you file a claim for Benefits, under normal circumstances, your claim will be acted upon by the Plan Administrator within thirty days (30) for medical benefits and forty five (45) days for wage replacement benefits, after receipt of your claim and written proof of loss. If the claim pertains to urgent care, i.e., life or health threatening, the Plan Administrator's decision will be made within 72 hours. If your claim is denied or reduced for any reason, the Plan Administrator will notify you of that action and the reasons why, with specific references to the Plan provisions that apply and any rules or policies applicable to the decision. The Plan Administrator will also tell you how you can appeal the decision and that you can bring a civil action under ERISA.

### Claim Denied or Reduced

If your claim is denied or reduced, you may file an appeal with the Plan Administrator. In order to make an appeal, you must submit a written request to the Plan Administrator within 180 days after your claim is first denied or reduced. In your request for an appeal, you may submit whatever comments or arguments you wish. During the review of your appeal, you may represent

## OCCUPATIONAL INJURY BENEFIT PLAN SUMMARY - ERISA

yourself or appoint a representative, and you will have the right to inspect all documents pertaining to the issue. You may submit written comments and if requested you will have access to documents relevant to your claim. The appeal will not be decided by the same person who made the initial determination.

The Plan Administrator must make its decision under normal circumstances within sixty (60) days after it receives the appeal for medical claims and forty five (45) days for wage replacement benefits. For claims involving urgent care the decision will be made within 72 hours after the appeal. The decision on appeal will be in writing and will include specific reasons for the decision and will notify you of your right to sue under ERISA as well as your right of access to relevant records, and any rules or policies applicable to the decision.

### Designated Agent for Service of Legal Process

Legal process may be served upon the Plan Administrator, see the Schedule of Benefits page.

### Plan Year End

The Plan Year is selected by the Company, see the Schedule of Benefits page.

### General Statement of ERISA Rights

The following statement of ERISA rights is required by Federal law and regulations to be included in this Plan document:

**Receive Information About Your Plan & Benefits**

As a Participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Security Act of 1974. This law called ERISA, provides that all Plan Participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office and at other specified locations such as work sites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the U. S. Department of Labor, such as detailed annual reports and Plan descriptions.

- Obtain copies of all Plan documents and other Plan information by writing to the Plan Administrator and asking for them. The Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant under the Plan with a copy of this summary financial report.

**Prudent Actions By Plan Fiduciaries**

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in your interest and in the interest of other Plan Participants and beneficiaries.

5

**OCCUPATIONAL INJURY BENEFIT PLAN SUMMARY - ERISA**

**Enforcement**

The law provides that no one, including your Employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from getting a benefit or exercising your rights under ERISA. The law provides that if your claim for a benefit is denied in whole or in part, you have a right to know why, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain times schedules. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce your rights. For instance, if you request copies of documents from the Plan and do not receive them within 30 days, you may file suit in federal court. In such a case, the court may require the Plan Administrator to provide the documents and pay up to $110 a day until you receive them, unless they were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may ask the U. S. Department of Labor for help, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If your suit is successful, the court may order the person you have sued to pay costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Compliance with ERISA & HIPPA**
(Health Insurance Portability & Accountability Act of 1996)

If you have any questions about this statement or about your rights under ERISA, you should get in touch with the nearest Area Office of the U. S. Labor-Management Services Administration of the Department of Labor, or contact the nearest Area Office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

If you have any questions about your Plan, you should see your Plan Administrator.

**PARA LOS EMPLEADOS QUE HABLAN ESPANOL**

ESTE RESUMEN DE LA DESCRIPCION DEL PLAN CONTIENE UN RESUMEN EN INGLES DE LOS DERECHOS Y BENEFICIOS DE SU PLAN DE BENEFICIOS EN CASO DE LESIONES DE EMPLEADOS DEL PATROCINADOR. SI TIENE ALGUNA DIFICULTAD PARA ENTENDER ALGUNA PARTE DE ESTE RESUMEN DE DESCRIPCION DEL PLAN, USTED DEBE COMUNICARSE CON SU SUPERVISOR DURANTE LAS HORAS NORMALES DE TRABAJO. TAMBIEN PUEDE COMUNICARSE CON EL ADMINISTRADOR DEL PLAN. O LLAMANDO AL NUMERO DE TELEFONO QUE APARECE EN EL DIRECTORIO DEL PLAN QUE SE INCLUYE EN EL RESUMEN DE LA DESCRIPCION DEL PLAN. SE ATIENDE DE LUNES A VIERNES DESDE LAS 8:00 A.M. HASTA LAS 5:00 P.M.

CAUSE NO. 2003-08-4370-G

| | |
|---|---|
| AVIGAIL MARTINEZ DE ROMERO § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS § | |
| GUARDIAN OF ANGEL ROMERO, § | |
| JR., MENTALLY AND PHYSICALLY § | |
| INCOMPETENT, ANGEL ROMERO § | |
| GONZALEZ AND GLORIA BADILLO § | |
| RODRIGUEZ DE ROMERO, THE § | |
| NATURAL PARENTS OF ANGEL § | |
| ROMERO, JR., AND, LUCILLA § | |
| DELGADO ROMERO AS NEXT § | |
| FRIEND OF ANGEL ROMERO § | |
| DELGADO AND CAROLINA § | |
| ROMERO DELGADO, MINOR § | |
| CHILDREN OF ANGEL ROMERO, JR. § | |
| § | |
| VS. § | CAMERON COUNTY, TEXAS |
| § | |
| UNIVAR USA, INC., § | |
| NEVGULMARCO, INC., § | |
| ZIMCO INC AND CARMELITA, § | |
| INC. AS THE OWNER/OPERATOR § | |
| OF THE M/V "CARMELITA" § | 404th JUDICIAL DISTRICT |



FILED 4:30 O'CLOCK P M
AURORA DE LA GARZA, CLERK
AUG 29 2003
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

## PLAINTIFFS' ORIGINAL PETITION AND REQUESTS FOR DISCLOSURES

COME NOW, AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., hereinafter called Plaintiffs, complaining of UNIVAR USA, INC., NEVGULMARCO., INC., ZIMCO INC. AND, CARMELITA INC. AS THE OWNER/OPERATOR OF THE M/V "CARMELITA", hereinafter called Defendants and for cause of action herein would respectfully show this Court the following:

SCANNED
SEP 0 8 2003

EXHIBIT NO. B

1

## I.

### Discovery Track

1.1    Plaintiffs plead that this case be assigned to a Level 3 Discovery Plan.

## II.

### PARTIES

2.1    Plaintiffs resided in Cameron County, Texas at all times pertinent to this cause of action accrued, and currently reside in Texas.  Plaintiffs are residents of Cameron County, Texas.

2.2    Defendant Univar USA, Inc., is a corporation duly authorized to conduct business in the state of Texas and may be served with process by serving its agent for service C. T. Corporation Services, 350 N. St. Paul, Dallas, Texas  75201.

2.3    Defendant Nevgulmarco, Inc. is a corporation duly authorized to conduct business in the State of Texas and may be served with process by serving its agent for service Mr. Walter Zimmerman at 400 Washington Street, Port Isabel, Texas  78578.

2.4    Defendant Zimco, Inc. is a corporation duly authorized to conduct business in the State of Texas and may be served with process by serving its agent for service Mr. Frank P. McEachern, 6000 NationsBank Plaza, 900 Main Street, Dallas, Texas  75202.

2.5    Defendant Carmelita, Inc. as the owner /operator of the M/V Carmelita is a Texas corporation with its principal place of business in Cameron County, Texas, duly authorized to conduct business in the State of Texas may be served with process and citation by serving it's agent for service, Mr. Walter Zimmerman, 400 Washington Street, Port Isabel, Texas  78578.

### III. JURISDICTION AND VENUE

3.1    Jurisdiction is appropriate in this Court in that this is a lawsuit seeking damages in excess of the minimum jurisdictional limits of the district courts of the State of Texas, and this Court has personal jurisdiction over Defendants.  Plaintiffs seek damages in excess of the minimum jurisdictional limits of this Court and of the $75,000 jurisdictional limits of the federal courts.

**SCANNED**

SEP 0 8 2003

2

3.2    Venue is proper in Cameron County under the General Venue Rule contained in Section 15.002 (a) (3) of the Texas Civil Practice and Remedies Code, because Cameron County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred. Specifically, the incident made the basis of this suit occurred in Cameron County, Texas. Venue is proper in Cameron County pursuant to Section 15.002(a)(2) of the Texas Civil Practice & Remedies Code because it is the county of Defendants', Nevgulmarco, Inc., Zimco, Inc., and Carmelita, Inc., as the owner/operator of the M/V Carmelit, principal office in Texas at the time of the incident.

## IV.

## CLAIMS FOR UNSEAWORTHINESS

4.1    Plaintiff Angel Romero, Jr. is a seaman, and in accordance with the terms of 28 U.S.C., Sec. 1916, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., file this suit for the enforcement of laws enacted for his health and safety.

4.2    Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., also bring this cause of action pursuant to the provisions of Article 46, U.S.C.A., Sec. 688, commonly known as the "Jones Act", and under the "Admiralty and General Maritime Laws of the United

SCANNED

SEP 0 8 2003

3

States," involving both the doctrines of "negligence" and "unseaworthiness," as well as any other relevant and applicable State and/or Federal laws.

## V.

5.1    Plaintiff AVIGAIL MARTINEZ DE ROMERO AS GUARDIAN OF ANGEL ROMERO, JR., asserts his right to recover damages for injuries ANGEL ROMERO, JR. received while employed as a seaman on the M/V "Carmelita ". This cause of action is brought pursuant to the provisions of Article 46, U.S.C.A., Sec. 688, commonly known as the "Jones Act" against Defendants Carmelita, Inc. and the M/V "Carmelita. as employers involving the doctrine of "negligence."

5.2    Plaintiff AVIGAIL MARTINEZ DE ROMERO AS GUARDIAN OF ANGEL ROMERO, JR. asserts their right to recover damages for injuries he received while employed as a seaman on the M/V "Carmelita ". This cause of action is brought pursuant to the "Admiralty and General Maritime Laws of the United States," against Defendant Carmelita. Inc., M/V "Carmelita," involving the doctrine of "unseaworthiness."

## VI.

### CAUSE OF ACTION FOR NEGLIGENCE UNDER THE JONES ACT

6.1    On the 21st day of July, 2003, the M/V "Carmelita" was engaged in shrimping operations and related activities in the Gulf of Mexico, and the Plaintiff was engaged in his duties as a seaman when the Defendants Carmelita, Inc., their agents, employees, and each of them, negligently and carelessly caused, allowed, and permitted the M/V "Carmelita", its appurtenances, and work method to be operated, supervised, equipped, controlled. designed, manufactured, maintained, and inspected in such a manner as to cause the Plaintiff to suffer injury and illness, proximately causing the injuries and damages hereinafter set forth.

6.2    On the 21st day of July, 2003, the Defendant Carmelita, Inc. as owner/operator of the M/V "Carmelita" their agents, employees, and each of them, were negligent. Said negligence includes, but is not limited to, the following acts, errors and omissions:

SCANNED

SEP 0 8 2003

4

1.  Negligently causing, allowing and permitting Plaintiff to become injured;

2.  Operating the M/V "Carmelita" in a negligent manner rendering the vessel unsafe as stated herein;

3.  Negligently failing to warn the Plaintiff of the dangerous and hazardous conditions as aforesaid;

4.  Negligently failing to provide the Plaintiff with a seaworthy and a safe place to work as stated herein;

5.  Negligently failing to promulgate and enforce proper and safe rules of seamanship in the supervision of said work as stated herein; and

6.  Negligently failing to provide sufficient and competent co-employees as stated herein.

6.3    By reason of the negligence of the Defendant Carmelita, Inc. as owner/operator of the M/V Carmelita, their agents, and employees, Plaintiff was caused to suffer illness and injuries to his person with great force and violence sustaining personal injuries and damages as hereinafter alleged.

## VII.

## SECOND CAUSE OF ACTION FOR UNSEAWORTHINESS

7.1    Plaintiffs reallege and incorporates by reference herein each and every allegation contained in the First Cause of Action above.

7.2    On the 21st day of July, 2003, the M/V "Carmelita" was engaged in shrimping operations and related activities in the Gulf of Mexico, and navigable waters of the United States, the unseaworthiness of the M/V "Carmelita" proximately caused Plaintiff to suffer injuries and illness as set forth below:

(a)    Defendants Carmelita, Inc. as owner/operator of the M/V "Carmelita" negligently failed to provide Plaintiff with a safe, seaworthy place to work as stated herein;

(b)    Said vessel was unseaworthy in causing, allowing and permitting Plaintiff to become injured and ill as stated herein;

SCANNED

SEP 0 8 2003

5

(c)    The work method was unsafe as stated herein;

(d)    The vessel did not have sufficient or competent fellow crewmembers as stated herein;

(e)    Defendant Carmelita, Inc.'s, as owner/operator of the M/V "Carmelita", negligence and that of their employees created an unseaworthy condition as stated herein;

(f)    In operating the vessel in a negligent manner, rendering the vessel unsafe as stated herein;

(g)    In failing to warn the Plaintiff of the dangerous conditions as aforesaid stated herein; and

(h)    In failing to promulgate and enforce proper and safe rules of seamanship in the supervision of said work as stated herein.

7.3    By reason of the unseaworthy condition of said vessel the Plaintiff was caused to suffer injuries.

7.4    As a direct and proximate result of the unseaworthiness of the vessel, Plaintiff was damaged as alleged in Sections 1 - 6, inclusive of the First Cause of Action herein, which are realleged and incorporated herein by this reference.

7.5    Each and every act, whether of commission or omission, or any combination of said act of commission or omission, constitutes negligence and gross negligence by the Defendant ship owner or operator, its master, agents, servants, and employees, and each such act or omission, or any combination of such acts or omissions was a proximate and/or contributing cause of the injuries sustained by the Plaintiffs.

7.6    The above act or acts, whether of commission or omission, and/or the operation of or the condition of the Defendant's vessel, the M/V "Carmelita", and/or its appurtenances, rendered the vessel unfit for its intended use and constituted a breach of an absolute duty owed by the Defendants to the Plaintiffs, and such acts, omissions. operation of the vessel. or the unsafe condition of the vessel and its appurtenances constituted a condition of

SCANN
SEP 0 8 2003

6

"unseaworthiness", and each was and is a "contributing cause" of the injuries suffered by the Plaintiffs.

## VIII.

### ALTER EGO AND SINGLE BUSINESS ENTERPRICE

8.1    Defendant Carmelita, Inc. as the owner/operator of the M/V "Carmelita" was operated by Nevgulmarco, Inc., as an alter ego. Defendants, Nevgulmmarco, Inc., and Carmelita, Inc. purposefully mismanaged the M/V "Carmelita " so that it operated undercapitalized and without taking reasonable and prudent business precautions.  These actions along with others are done with the purpose of defrauding creditors and others to whom they become liable. Furthermore, Plaintiff asserts the doctrine of alter ego as a result of said corporate fiction because said corporation is organized and operated as a mere tool or business conduit of Nevgulmarco, Inc..  Additionally, Plaintiff asserts that said Carmelita, Inc., in its current state of financial weakness and/or inability to respond to claims, is no less than a shell and a perpetuated fraud upon this Court.  Moreover, Plaintiffs assert that the activities for which said corporation operates, has created an extreme risk of harm upon the corporation's employees, and, said corporation has not reasonably calculated to respond to claims in light of the nature and risk and of the business, and as such, the piercing of the corporate veil and holding the individual shareholders liable for the tort liability of the corporation is appropriate under these circumstances.  Therefore, for purposes of these pleadings, Plaintiffs allege that Nevglmarco, Inc. and Carmelita, Inc., are alter egos, and/or piercing the corporate veil and holding the individual shareholders liable for the debts, obligations, and liabilities of said corporation is afforded to the Plaintiff under these tort circumstances.

8.2    Alternatively, Nevgulmarco, Inc. and Carmelita, Inc. are operated as a single business enterprise, so that the conduct of one entity is imputed to the other entity and the entities are jointly and severally liable of the conduct of each other.



SCANNED

SEP 0 8 2003

7

## IX.

## FACTUAL BACKGROUND

9.1     Upon information and belief that at all times material hereto, Plaintiff would show that on or about July 21, 2003, the fishing vessel, "Carmelita" was shrimping near shore waters of the Gulf of Mexico. The crew of the "Carmelita" consisted of local shrimpers, including Angel Romero, Jr., winchman, Gerardo Gonzalez, header and Captain Javier.

9.2     As shrimp were caught by the crew of the "Carmelita", they were stored in the hold, which is an airtight compartment. The shrimp are stored by first dipping the shrimp in shrimp dip solution. The shrimp is coated with Sodium Metabisulfite, as a shrimp dip, to preserve the color of the shrimp until the shrimp reaches the nearby port and/or the shrimp are unloaded.

9.3     On this particular voyage, the shrimping was excellent and the "Carmelita" was able to fill her hold with many pounds of shrimp.

9.4     During the period of time the "Carmelita" was shrimping, the airtight  hold remained covered. As the shrimp which were dipped in Sodium Metabisulfite solution were stored in the hold, it formed the lethal gas, Sulfur Dioxide. Sulfur Dioxide gas is denser than air and over a period of time it displaced the air and created a death trap loaded to kill or injure anyone who entered the hold.

9.5.    On or about July 21, 2003, while the vessel was at sea, ANGEL ROMERO, JR. was specifically ordered by the Captain Javier to go to the hold. ANGEL ROMERO, JR. removed the hatch cover and descended into the hold of the vessel to carry out his specific orders. While working in the hold, ANGEL ROMERO, JR. inhaled Sulfur Dioxide fumes, which caused him to fall and collapse in the hold. After a short period of time, Captain Javier noticed the failure of ANGEL ROMERO, JR. to return. The Captain then ordered Gerardo Gonzalez, the header to go and check on and/or help ANGEL ROMERO, JR. Gerardo Gonzalez saw his crewmember, ANGEL ROMERO, JR. on the floor of the hold. Gerardo Gonzalez descended



SEP 0 8 2003

8

into the hold to assist and/or rescue Angel Romero, Jr. On July 21, 2003, a Coast Guard rescue craft retrieved Angel Romero, Jr. from the M/V Carmelita.

9.6     Subsequent medical care revealed that ANGEL ROMERO, JR. suffered a hypoxic event from asphyxiation due to inhalation of Sulfur Dioxide gas which was generated by the Sodium Metabisulfite used on deck of the M/V "Carmelita" to dip the shrimp caught which were then properly placed into the hold.

9.7     Upon information and belief that at all times material hereto, Plaintiffs would show that Defendants Univar USA, Inc. Nevgulmarco, Inc. Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" are in the business of manufacturing, packaging, labelling, exporting, importing, distributing, selling and/or providing various chemicals and chemical compounds. At some time prior to the occurrence made the basis of this lawsuit, the Defendant Univar USA, Inc. manufactured, packaged, labeled, exported, imported, sold, distributed and/or provided the chemical compound Sodium Metabisulfite (Sodium Bisulphite Anhydrous), for the following uses:

(a)     Food and drink manufacture: for preservation and sterilization purposes, also refining of sugar;

(b)     Brewing, wine making, etc.: For sterilization in the fermentation processes;

(c)     Photographic chemicals: In formulation of developers and fixers;

(d)     Dyehouses/Laundries: As a color stripper and anti-chlor;

(e)     Leather Industry: In tanning as an acidifying agent, a solubilishing agent for tannins and as an agent in reducing chrome liquors;

(f)     Mineral extraction: As an ore flotation aid;

(g)     Effluent treatment: To reduce chromium salts to render them suitable for precipitation using lime;

(h)     Chemical manufacture: As a process chemical in the manufacture of sulphosuccinates and sodium formaldehyde bisulphite; and,

(i)     Rubber manufacture: As a latex anti-coagulant.


SCANNED
SEP 0 8 2003

9.8     Sodium Metabisulfite is a white crystalline powder with a slight sulfur odor and taste.  When Sodium Metabisulfite reacts with water, it forms the lethal gas, Sulfur Dioxide. Sulfur Dioxide is a colorless gas with a smell characteristic of burning sulfur and is acutely injurious to the health of anyone who is unfortunate enough to inhale the fumes.

9.9     For many years prior to July 21, 2003, Sodium Metabisulfite, amongst its many other uses, had been used in the shrimping industry as a preservative for the freshly caught shrimp while they were stored on board the shrimp trawlers prior to their return to port. Defendant Univar USA, Inc., Nevgulmarco, Inc. Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" regularly manufactured and/or distributed large quantities of Sodium Metabisulfite and knew or should have known of its chemical properties, i.e., that reaction with water forms lethal Sulfur Dioxide gas.  In their normal course of business Univar USA, Inc., Nevgulmarco, Inc. Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" knew or should have known that it was selling and/or distributing Sodium Metabisulfite to shrimpers, to be used aboard their shrimp trawlers as a preservative for freshly caught shrimp.

9.10    Plaintiffs would show further that at some time prior to July 21, 2003, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita"  packaged, sold and/or provided Sodium Metabisulfite in 50-pound paper bags and/or plastic pails.

9.11    On the fifty (50) pound bags and/or plastic pails of Sodium Metabisulfite sold, packaged and/or provided by Defendants Univar USA, Inc. Nevgulmarco, Inc. Zimco. Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita", there appeared no instructions or effective warning whatsoever.

9.12    The label on the bags and/or plastic pails of the Sodium MetaBisulfite was so inadequate and insufficient as to be no label or warning at all.  Failure to give an adequate or sufficient warning on the packages of Sodium Metabisulfite made their use unreasonably dangerous and not suited for the purpose for which it was intended, and Defendants. Univar

SCANNED
SEP 08 2003

10

USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita", had a duty to protect ultimate users from injury by giving proper instructions and warnings, and failure to do so was a proximate cause of the injuries of ANGEL ROMERO, JR. and his family.

9.13    Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" sold and/or provided fifty-pound bags and/or plastic pails of Sodium Metabisulfite to be used on board the M/V "Carmelita", as a shrimp preservative.

9.14    Failure to print and/or affix  adequate and sufficient labels to the paper bags and/or plastic pails of Sodium Metabisulfite sold and/or provided, with knowledge and appreciation of the fact that shrimpers would be using these compounds in close proximity to water for dipping the shrimp catch and storing such dipped shrimp catch in enclosed spaces without ventilation rendered these packages of Sodium Metabisulfite unreasonably dangerous and not reasonably fit for the purposes for which they were intended. Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" impliedly warranted that Sodium Metabisulfite was suitable for use as a preservative on board a shrimp boat.

9.15    Medical examination of  ANGEL ROMERO, JR. revealed that he suffered from asphyxiation and a hypoxic event due to the inhalation of Sulfur Dioxide gas.  The Sulfur Dioxide gas was generated from Sodium Metabisulfite that was placed on board the M/V Carmelita by the Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" to be used as a preservative for the shrimp caught during the voyage.

9.16    The hypoxic brain injury to ANGEL ROMERO, JR. was in no way caused or contributed to by any fault, neglect, want of care, or design on his part, but to the contrary, was proximately caused by the negligence, fault, lack of care, and inattention to duty of Defendants Univar USA, Inc., Nevgulmarco, Inc.,  Zimco, Inc. and, Carmelita, Inc. as owner/operator of the

11

SCANNED

SEP 0 8 2003

M/V "Carmelita" in providing the Sodium Metabisulfite in containers that were insufficiently or inadequately labeled; in knowing that the Sodium Metabisulfite would be placed on board for use in dipping shrimp and placing such dipped shrimp in the air tight hold of the M/V Carmelita when they knew or should have known that said chemical was dangerous and would create an unsafe place to work; and, in failing to give ANGEL ROMERO, JR. sufficient instructions or warnings concerning the proper use of Sodium Metabisulfite in the hold.

9.17    Defendants operated their companies in their own self-interest and failed to push for and accelerate the use of proper warnings or safer alternatives and economically feasible designs.

9.18    Defendants even in their own claims department had no procedure in which their claims department members would be informed as to the number and severity of injuries and deaths occurring from the use of Sodium Metabisulfite.

9.19    Defendants have systematically in the past, and also in response to deaths and injuries, manipulated the information provided to them by witnesses.  More specifically, it has been and has continued to be the practice of the Defendants through its departments, to ignore and not document those witnesses who would verify that the use of chemical Sodium Metabisulfite results in deaths and/or severe injuries.

## X.

### STRICT LIABILITY

10.1    Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" are strictly liable for marketing defects, failing to warn, breach of warranties and/or §402B of the Restatement of Torts 2d, as adopted by the Texas Supreme Court.

10.2    Plaintiffs would show that the Defendants were for some time prior to July 21, 2003, and still are, engaged in the business of manufacturing, packaging, exporting, importing, distributing, selling, and/or delivering Sodium Metabisulfite for use by the public, including Angel Romero, Jr.   It was reasonably foreseeable that ANGEL ROMERO, JR. would use said

SCANNED

SEP 0 8 2003

Sodium Metabisulfite because it was sold and then provided to Plaintiff ANGEL ROMERO, JR. Said Sodium Metabisulfite was defective in that it was not provided to ANGEL ROMERO, JR. with adequate instructions or warnings. Said defects made the Sodium Metabisulfite unreasonably dangerous. These defects existed at the time the Sodium Metabisulfite left the control of the Defendants. At the time of the incident made the basis of this lawsuit, on or about July 21, 2003, the Sodium Metabisulfite was being used by ANGEL ROMERO, JR. in the manner in which it was intended to be used and/or in a reasonably foreseeable way. As a result of the defects, Plaintiffs suffered injuries and damages as a result of ANGEL ROMERO, JR.'S hypoxic event and any of the defects alone or in concert were a producing cause of Plaintiffs' injuries and damages.

    10.3    Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and Carmelita, Inc. as owner/operator of the M/V "Carmelita" owed a duty to manufacture, package, export, import, distribute, sell, and/or deliver safe Sodium Metabisulfite, so as not to cause injuries or damages to the general public including  ANGEL ROMERO, JR. and his family.  Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" violated their duties when they manufactured, packaged, exported, imported, distributed, sold and delivered the defective Sodium Metabisulfite, as described hereinabove, to ANGEL ROMERO, JR.

    10.4    It was foreseeable that ANGEL ROMERO, JR. and thus his family could have been injured or suffered damages as a result of the acts or omissions to act of Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" because of Defendants' special knowledge of the product.  As a result of the acts or omissions of Defendants in manufacturing, packaging, exporting. importing, distributing, selling, and delivering defective Sodium Metabisulfite, ANGEL ROMERO, JR. and his family suffered injuries and damages as more fully set forth hereinafter, and said acts or omissions were the actual and proximate cause of  ANGEL ROMERO, JR. and his family's injuries and damages.

13

SCANNED

SEP 0 8 2003

## XI

## NEGLIGENCE

11.1    Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" owed a duty to inspect, maintain and keep said Sodium Metabisulfite in safe condition, so as to not cause injuries and damages to the general public, including  ANGEL ROMERO, JR. and/or their families.  Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" violated their duty when they carelessly inspected and maintained, or failed to inspect, maintain and keep the Sodium Metabisulfite in a safe condition.

11.2    It was foreseeable that  ANGEL ROMERO, JR. and his family could have been injured and/or suffered damages as a result of the acts, or omissions to act of Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and, Carmelita, Inc. as owner/operator of the M/V "Carmelita" because of their special knowledge of the product.  As a result of said acts, or omissions to act by Defendants, ANGEL ROMERO, JR., and his family suffered injuries and damages as more fully set forth hereinafter, and said acts or omissions to act were the actual and proximate cause of  ANGEL ROMERO, JR. and his family's injuries and/or damages.

## XII.

## BREACH OF WARRANTIES

12.1    Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita", impliedly and expressly guaranteed that the Sodium Metabisulfite had been so manufactured, packaged, exported, imported, distributed, sold and/or delivered such that it would provide the actual benefit for which it was manufactured, and was of such quality that it would not fail to perform its activity under normal circumstances and cause injuries or damages.  Through said Defendant Univar USA, Inc.'s advertising programs, in which it solicits the public to purchase Sodium Metabisulfite which they manufacture, package, export, import, distribute, sell and/or deliver said Defendant warrants and guarantees that



SCANNED

SEP 0 8 2003

Sodium Metabisulfite is suitable for its purpose and safe to use.   ANGEL ROMERO, JR. as a foreseeable user relied upon said Defendants' warranties and guarantees.

12.2    Said Defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and Carmelita, Inc. as owner/operator of the M/V "Carmelita", breached the said warranties by manufacturing, packaging, exporting, importing, distributing, selling and delivering defective and unsafe Sodium Metabisulfite as hereinabove described.

12.3    As a result of said Defendants' breach of warranties, ANGEL ROMERO, JR. and his family have been injured as hereinafter described.   ANGEL ROMERO, JR. and his family have given notice to said Defendants within a reasonable time of discovery of the cause of ANGEL ROMERO, JR. and his family's injuries and damages and remedies at law.

### XIII.

### GROSS NEGLIGENCE and MALICE

13.1    Additionally, Plaintiffs say that Defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and Carmelita, Inc. as owner/operator of the M/V "Carmelita", are guilty of negligence, gross negligence, and malice in the manufacturing, packaging, exporting, importing, distributing, selling, and/or delivering of the Sodium Metabisulfite in question including but not limited to:

(a)    in providing too small of a label;

(b)    in failing to provide printing within the label which was large enough to easily read;

(c)    in failing to provide the color of printing that would draw attention to such use and warnings other than the normal printing provided on such package;

(d)    in failing to provide an antidote in case someone did inhale Sulfur Dioxide Gas;

(e)    in failing to warn that inhaling Sulfur Dioxide gas was deadly, could cause serious injury, and/or could suffocate;

(f)    in failing to warn the ultimate users of Sodium Metabisulphite of the defect or defects described above;

15

SCANNED

SEP 0 8 2003

(g)    in committing errors during the design phase of the label;

(h)    in failing to install adequate safety warnings;

(i)    in using safety warnings which failed in their purpose;

(j)    in failing to make adequate testing or checks after manufacture;

(k)    in using unsafe or unsuitable materials in manufacture;

(l)    in failing to plan and test foreseeable uses;

(m)    in failing to use reasonable and necessary packaging;

(n)    in failing to keep abreast of scientific knowledge;

(o)    in failing to measure up to or meet accepted chemical industry and/or packaging standards;

(p)    in failing to do adequate research;

(q)    in failing to adopt safe designs to carry out the intended use; and

(r)    in failing to use safer chemical compounds equally effective for food preservation.

13.2    Failure to provide a warning label with the degree of intensity that would cause a reasonable man to exercise caution for his own safety commensurate with the danger and the failure to supply a sufficiently prominent label to users of their product required to work in close proximity to this dangerous chemical compound, constituted negligence, gross negligence and/or malice on the part of the defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita."

13.1    The conduct of defendants and their agents, set out above, were carried out wilfully, maliciously, oppressively, and constituted such an entire want of care as to constitute a conscious indifference to the rights or welfare of these plaintiffs. Such conduct was outrageous as defined by Texas common law, and Plaintiffs are hereby entitled to recover exemplary damages to deter such cruel and undignified procedures by the defendants and defendants' agents in the future. In this connection, Plaintiffs will show that their treatment by the defendants caused their suffering of immeasurable dimensions.

SCANNED

SEP 0 8 2003

13.4    The total want of care and the utter disregard of duty, while the Defendants knew or should have known of the unsafe condition of Sodium Metabisulfite as well as their misrepresentations in allowing such defective products in the stream of commerce, exhibits and reflects a total want of care, and a conscious and wilful indifference to the lives and safety of ANGEL ROMERO, JR., Plaintiffs and others similarly situated. The nature, scope and extent of the operation of Defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc. and, Carmelita, Inc. as owner/operator of the M/V "Carmelita", and other manufacturers, packagers, exporters, importers, distributors, sellers, and deliverers similarly situated require a significant award of punitive and/or exemplary damages if said Defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco, Inc., and Carmelita, Inc. as owner/operator of the M/V "Carmelita" and other similarly entities, are to take heed and be influenced by said award, to conduct their business and to warn with due regard and concern for those who might be using such preservative chemicals.

13.5    Even though, previous litigation of claims against manufacturers, packagers, exporters, importers, distributors, sellers and/or deliverers have resulted in the awarding of tens of millions of dollars in punitive and/or exemplary damages for causing the injuries and deaths of persons using Sodium Metabisulfite, such manufacturers, packagers, exporters, importers, distributors, sellers, and/or deliverers continue to ignore the safety of humans and such companies continue to place profits over the lives of people. Thus, even greater sums must be assessed against these Defendants to change their conscious indifference in promoting and persisting to provide this deadly chemical for use on food for human consumption.

13.6    Accordingly, Plaintiffs request that exemplary damages be awarded against the Defendants in amounts which exceed the minimum jurisdictional requirements of this Court, and asks the jury to consider the following facts in awarding exemplary damages: awarding damages for punishment of the defendants; to compensate for inconvenience; to compensate for attorney's fees; for expenses of litigation; and, to serve as an example to others.



SCANNED

SEP 0 8 2003

17

## XIV.

## CIVIL CONSPIRACY

14.1    The Plaintiffs would show that the Sodium Metabisulfite industry has a history of resisting proposed safety standards and effectively utilizing the political process and their economic power to minimize the resulting economic cost that adoption of realistic minimum safety standards would naturally entail.

14.2    Profit has had priority over safety during the Sodium Metabisulfite industry's years of operation.  The priority has been reflected by the deliberate pattern of conduct by the Defendants for many years.

14.3    The Defendants' lack of safety is the direct result of a conspiracy by said chemical companies and/or providers to control the adoption of the minimum regulatory standards and to act in concert to restrict, delay, or defeat proposals for stronger standards that provide the public safe use of food preservatives to enhance survivability and insure reduction of catastrophic injuries and death to the public.

14.4    Said covert and overt conspiracy is and has been manifested by, but is not limited to, some of the following particulars:

(a)    Organizing and actively joint venturing in seizing and maintaining control over the industry trade organizations by various methods including control of grants and other influencing acts;

(b)    Actively influencing the Regulatory Agencies by asserting political pressure on elected, appointed or employed officials to achieve the conspiratorial goals:

(c)    By acting in concert with other chemical companies to ensure appointment of sympathetic political appointees to the regulatory agencies charged with adopting minimum safety standards related to proper use of chemicals;

(d)    In recruiting and employing members of Regulatory Agencies to assist in the goal of obstruction and opposing adoption of new and more stringent standards,

18



SEP 0 8 2003

or to delay the adoption of such standards, and/or minimize any meaningful changes to existing standards;

(e)   By having trade organizations they control act in concert with said defendant companies whether covertly or overtly, in recommending and submitting to the regulatory agencies reasons for delay for adopting new standards, for changes, modifications or adoptions of existing minimum standards;

(f)   By actively delaying, obstructing, and opposing litigation discovery efforts by victims who have been injured as a result of the dangerous conditions who seek redress in the courts.   This has been virtually universal to all Sodium Metabisulfite cases in litigation cases for a number of years.   These tactics frustrate the process of discovery, make the cost of litigation prohibitive, and furthers the aims and economic objectives of the conspirators;

(g)   Concealing from their own employees, the public, from injured persons, and from governmental entities information regarding accidents all in violation of their common law duty to act with reasonable care;

(h)   Concealment of several thousand pages of evaluation, statistics, information, documents regarding the deadliness of Sodium Metabisulfite;

(i)   Engaging in advertising, informational and propaganda programs which expressly and by implication misrepresent that Sodium Metabisulfite is safe and not deadly.

(j)   resist the adoption of adequate safety standards;

(k)   delay the effective date for new standards to become mandatory and,

(l)   seek minimal standards as opposed to realistic standards which address concerns for the safety of the public over the increased costs involved.

14.5   The conspiracy (among otherwise vigorous competitors) was predicated solely on economic self-interest whereon profit was a priority over safety to the public. The actions of the conspirators, including the Defendants herein, has been successful in influencing the standards adopted, as well as delaying adoption of standards addressing Defendants' own knowledge of

SCANNED

SEP 0 8 2003

long standing known deficiencies and dangerous conditions constituting unnecessary hazardous risks to the public.

14.6    Such conspiracy was a proximate cause of the injuries to   ANGEL ROMERO, JR. and of the damages suffered by Plaintiffs.

## XV.

## DAMAGES

15.1    As a direct and proximate result of the acts and/or omissions of the Defendants, individually and/or collectively, Plaintiff AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICIALLY   INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND,  LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., would show that by reason of the injuries sustained as above alleged, ANGEL ROMERO, JR. suffered serious injuries to his body including disfigurement, and impairment, physical pain and suffering, mental anguish, loss of wages and earning capacity and medical expenses. These damages have been sustained in the past and will continue in the future. By reason of the foregoing, ANGEL ROMERO, JR.  and his family have been damaged by and seeks from the Defendants an amount in excess of the minimum jurisdictional limits of this court.

15.2    The charges which have been made for services rendered to ANGEL ROMERO, JR. have represented and will represent the usual, reasonable and customary charges for like or similar services in the vicinity where they have been rendered.  All  of these services have been

SCANNED
SEP 0 8 2003

made necessary in connection with the proper treatment of the injuries sustained and suffered by Plaintiffs because of ANGEL ROMERO, JR.'S injuries and damages.

15.3    Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., would further show that in the event Angel Romero, Jr. had pre-existing conditions in his body prior to the incident made the basis of this suit, that such conditions were aggravated and/or re-injured and worsened by the injuries sustained as a result of the negligence of the Defendants.

15.4    On the date of the incident out of which this suit arises, Plaintiff ANGEL ROMERO, JR. was a man of the age of 35 and had a life expectancy in excess of 40.1 according to the U.S. Life Tables of 1989.

15.5    Plaintiff AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., would further show that a result of the defendants' negligence, plaintiffs have suffered a loss of future services that would have been provided by ANGEL ROMERO, JR. had he not suffered such severe injuries.

15.6    Plaintiffs Avigail Martinez de Romero Individually and as the Guardian of Angel Romero, Jr., Mentally and Physically Incapacitated, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL

SCANNED
SEP 0 8 2003

ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., seek damages for total loss of past wages and future earning capacity which was proximately caused by the negligence of Defendants.

15.7    Additionally, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., seek non-pecuniary damages from Defendants, Univar USA, Inc., Nevgulmarco, Inc., Zimco Inc., and Carmelita, Inc. as the owner/operator of the M/V "Carmelita" for their loss of consortium and society as a result of the horrible injuries of their husband, father and son ANGEL ROMERO, JR. This element of damages includes any loss of positive benefits, flowing from the love, comfort, companionship and society of ANGEL ROMERO, JR. Furthermore, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., have suffered emotional pain, torment, and suffering because of their husband, father and son's hypoxic and/or comatose state. In all reasonable probability, Plaintiffs will continue to suffer these damages, among others, for a long time into the future, if not for the rest of their natural life. Plaintiffs, AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO,

SCANNED

SEP 0 8 2003

JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., also seek from Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco Inc., and Carmelita, Inc. as the owner/operator of the M/V "Carmelita", damages for their mental anguish that is, emotional pain, torment and suffering experienced because of their husband, father and son's hypoxic and/or comatose state.

15.8    Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., also seek damages for their loss of household services that they have been deprived of and are likely to be deprived of as a result of the injuries which resulted in their husband, father and son's hypoxic and/or comatose state. Defendants' acts have proximately caused the loss of household services ANGEL ROMERO, JR. would have provided his wife, children and parents, that is the ability to administer their needs.

15.9    Additionally, as a result of ANGEL ROMERO, JR.'S injuries, which resulted in his hypoxic and/or comatose state, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR have required psychological and psychiatric care. They have been required to pay and incur liability to pay the charges which have been and will be made for such psychological and psychiatric care services. It is reasonably probable that they will require additional

SCANNED

SEP 0 8 2003

psychological care and psychiatric services in that they will be required to pay and incur liability to pay the charges which will be made for such services.

15.10  The charges which have been and will be made for services rendered to plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., have represent the usual, reasonable, and customary charges for the like or similar services in the vicinity where they have been or will be rendered. All of these services both past and future, have been and will be made necessary in connection with the proper treatment of the injuries sustained and suffered by Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., as a result of ANGEL ROMERO, JR.'S severe injuries.

15.11  Additionally, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR also seek from the Defendants Univar USA, Inc., Nevgulmarco, Inc., Zimco Inc. and, Carmelita, Inc. as the owner/operator of the M/V "Carmelita" damages for their mental anguish, grief,

SCANNED

SEP 0 8 2003

bereavement for loss of companionship that they have experienced in the past and will, in all reasonable probability, experience in the future because of their husband, father and son's severe injuries which resulted in ANGEL ROMERO, JR.'S hypoxic and/or comatose state.

15.12  As a result of all of the aforementioned, Plaintiffs AVIGAIL MARTINEZ DE ROMERO INDIVIDUALLY AND AS GUARDIAN OF ANGEL ROMERO, JR., MENTALLY AND PHYSICALLY INCOMPETENT, ANGEL ROMERO GONZALEZ AND GLORIA BADILLO RODRIGUEZ DE ROMERO, THE NATURAL PARENTS OF ANGEL ROMERO, JR. AND, LUCILLA ROMERO DELGADO AS NEXT FRIEND OF ANGEL ROMERO DELGADO AND CAROLINA ROMERO DELGADO, MINOR CHILDREN OF ANGEL ROMERO, JR., have suffered damages in an amount in excess of the minimum jurisdictional limits of this Court. Plaintiffs also seek prejudgment and post judgment interest at the highest lawful rate.

## XVI.

### Punitive Damages

16.1  Because Defendants are guilty of wilful acts and omissions, gross neglect, and malice, they should have punitive damages assessed against them in an amount deemed appropriate by the jury.

## XVII.

### CONDITIONS PRECEDENT

17.1  Pursuant to Rule 54 of the Texas Rules of Civil Procedure, all conditions precedent to Plaintiffs' rights to recover herein and to Defendants' liability have been performed or have occurred.

SCANNED
SEP 0 8 2003

## XVIII.

### REQUESTS FOR DISCLOSURE

18.1    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Plaintiffs request that Defendants UNIVAR USA, INC., NEVGULMARCO, INC., ZIMCO, INC. AND CARMELITA, INC. AS THE ONWER/ OPERATOR OF THE M/V "CARMELITA" disclose, within 50 days of service of this request, the information and material described in Rule 194.2 of the Texas Rules Civil Procedure.

### XIX. JURY DEMAND

19.1    Plaintiffs request a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendants, and each of them, be duly cited in terms of law to appear and answer herein and that upon trial hereof Plaintiffs have judgment against said Defendants, jointly and severally, in an amount in excess of the minimum jurisdictional limits of this court with pre-judgment interest and post judgment interest thereon at the legal rate. In addition thereto, Plaintiffs seek exemplary and/or punitive damages against the Defendants together with post judgment interest on said judgment at the highest legal rate until paid, for costs of court in their behalf expended, and for such other and further relief,  special and general, at law and/or in equity, to which they may show themselves justly entitled.

Additionally, Plaintiffs seek to recover from the defendant Carmelita, Inc. as owner of the M/V "Carmelita" judgment in an amount in excess of the minimum jurisdictional limits of this court to compensate them for the injuries received by ANGEL ROMERO, JR. as a result of the "negligence" and "gross negligence" of the Defendant Carmelita, Inc. as owner of the M/V "Carmelita" their master, agents, officers, servants, and employees, or as a result of the "unseaworthiness".

SCANNED
SEP 0 8 2003

Respectfully submitted,

WATTS LAW FIRM, L.L.P.

Fort Brown Plaza
1926 East Elizabeth Street
Brownsville, Texas  78520
Telephone:    (956) 544-0500
Telecopier:    (956) 541-0255

By: _____
MIKAL C. WATTS
State Bar No. 20981820

RAY R. MARCHAN
State Bar No. 12969050

LAW OFFICES OF  ERNESTO GAMEZ, JR.

Justice For All Building
777 East Harrison Street
Brownsville, Texas 78520
Telephone:  (956)541-3820
Telecopier:  (956)541-7694

By: _____
ERNESTO GAMEZ, JR. (with permission)
State Bar No. 07606608
9901

SCANNED
SEP 0 8 2003

27